**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

TYTTI FALLON,

     Plaintiff,                             Case No.: 1:24-cv-00046

v.

THE PARTNERSHIPS AND UNINCORPORATED
ASSOCIATIONS IDENTIFIED ON SCHEDULE "A",

     Defendants.

## COMPLAINT

Plaintiff, TYTTI FALLON ("Fallon" or "Plaintiff"), by Plaintiff's undersigned counsel, hereby complains of the Partnerships and Unincorporated Associations identified on Schedule A attached hereto (collectively, "Defendants"), and for Plaintiff's Complaint hereby alleges as follows:

### JURISDICTION AND VENUE

1.    This Court has original subject matter jurisdiction over the claims in this action pursuant to the provisions of the Federal Copyright Act, 17 U.S.C. § 101, et seq., 28 U.S.C. § 1338(a)–(b), and 28 U.S.C. § 1331.

2.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may properly exercise personal jurisdiction over Defendants since each of the Defendants directly targets consumers in the United States, including Illinois, through at least the fully interactive commercial internet stores operating under the Defendant aliases and/or the online marketplace accounts identified in Schedule A attached hereto (collectively, the "Defendant Internet Stores"). Specifically, Defendants are reaching out to do business with Illinois residents by operating one or more commercial, interactive internet stores through which Illinois residents can purchase

1

products bearing infringing versions of Plaintiff's copyrighted work. Each of the Defendants has targeted Illinois residents by operating online stores that offer shipping to the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, has sold products bearing infringing versions of Plaintiff's federally registered copyrighted work to residents of Illinois. Each of the Defendants is committing tortious acts in Illinois, is engaging in interstate commerce, and has wrongfully caused Plaintiff substantial injury in the State of Illinois.

**INTRODUCTION**

3.      Plaintiff, TYTTI FALLON, is the owner of the federal copyright registration that protects the creative content of Plaintiff's images and illustrations. Fallon is a self-taught artist who creates adult coloring pages, notebooks, and gratitude journals, with unique designs.

4.      This action has been filed by Plaintiff to combat online copyright infringers who trade upon Plaintiff's reputation, goodwill, and valuable copyright by selling and/or offering for sale products in connection with Plaintiff's illustration. In addition, the Defendants are selling unauthorized products that are based on and derived from the copyrighted subject matter of Plaintiff's illustration.

5.      Plaintiff is the owner of United States Copyright Registration No. VA 2-348-301 (the "Tytti Fallon Work") and the registration is attached hereto as **Exhibit 1**. Upon information and belief, the copyright has an effective date that predates the Defendants' acts of copyright infringement.

6.      In an effort to illegally profit from the creative content of the Tytti Fallon Work, Defendants have created numerous Defendant Internet Stores and designed them to appear to be selling authorized Tytti Fallon Products.

2

7.     The Defendant Internet Stores share unique identifiers, such as design elements and similarities of the unauthorized products offered for sale, establishing a logical relationship between them and suggesting that Defendants' illegal operations arise out of the same transaction, occurrence, or series of transactions or occurrences. Defendants attempt to avoid liability by going to great lengths to conceal both their identities and the full scope and interworking of their illegal operation. Plaintiff is forced to file this action to combat Defendants' piracy of the Tytti Fallon Work. Plaintiff has been and continues to be irreparably damaged through loss of control over the creative content of the valuable copyright, reputation, goodwill, the quality, and ability to license as a result of Defendants' actions and seeks injunctive and monetary relief.

8.     The rise of online retailing, coupled with the ability of e-commerce sites to hide their identities, has made it nearly impossible for policing actions to be undertaken by Plaintiff since availing itself of takedown procedures to remove infringing products would be an ineffective and endless game of whack-a-mole against the mass piracy that is occurring over the internet. Sadly, a swarm of infringers have decided to trade upon Plaintiff's reputation, goodwill, and valuable copyright by selling and/or offering for sale products in connection with Plaintiff's illustration. The aggregated effect of the mass piracy that is taking place has overwhelmed Plaintiff and Plaintiff's ability to police Plaintiff's rights against the hundreds of anonymous defendants which are selling illegal infringing products at prices below an original.

9.     To be able to offer the infringing products at a price substantially below the cost of original, while still being able to turn a profit after absorbing the cost of manufacturing, advertising, and shipping requires an economy of scale only achievable through a cooperative effort throughout the supply chain. As Homeland Security's recent report confirms, counterfeiters act in concert

through coordinated supply chains and distribution networks to unfairly compete with legitimate brand owners while generating huge profits for the illegal pirating network:

> Historically, many counterfeits were distributed through swap meets and individual sellers located on street corners. Today, counterfeits are being trafficked through vast e-commerce supply chains in concert with marketing, sales, and distribution networks. **The ability of e-commerce platforms to aggregate information and reduce transportation and search costs for consumers provides a big advantage over brick-and-mortar retailers. Because of this, sellers on digital platforms have consumer visibility well beyond the seller's natural geographical sales area.**
>
> . . .
>
> Selling counterfeit and pirated goods through e-commerce is a highly profitable activity: production costs are low, millions of potential customers are available online, transactions are convenient, and listing on well-branded e-commerce platforms provides an air of legitimacy.
>
> . . .
>
> The impact of counterfeit and pirated goods is broader than just unfair competition. Law enforcement officials have uncovered intricate links between the sale of counterfeit goods and transnational organized crime. **A study by the Better Business Bureau notes that the financial operations supporting counterfeit goods typically require central coordination**, making these activities attractive for organized crime, with groups such as the Mafia and the Japanese Yakuza heavily involved. Criminal organizations use coerced and child labor to manufacture and sell counterfeit goods. In some cases, the proceeds from counterfeit sales may be supporting terrorism and dictatorships throughout the world.

*See* Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods*, Jan. 24, 2020, (https://www.dhs.gov/publication/combating-trafficking-counterfeit-and-pirated-goods), at 10, 19 (emphasis added) attached hereto as **Exhibit 2**.

10.     The Defendant Internet Stores share unique identifiers, such as design elements and similarities of the unauthorized products offered for sale, establishing a logical relationship between them and suggesting that Defendants' illegal operations arise out of the same transaction, occurrence, or series of transactions or occurrences. Defendants use aliases to avoid liability by going to great lengths to conceal both their identities as well as the full scope and interworking of their illegal network. Despite deterrents such as takedowns and other measures, the use of aliases enables infringers to stymie authorities:

4

The scale of counterfeit activity online is evidenced as well by the significant efforts e-commerce platforms themselves have had to undertake. A major e-commerce platform reports that its proactive efforts prevented over 1 million suspected bad actors from publishing a single product for sale through its platform and blocked over 3 billion suspected counterfeit listings from being published to their marketplace. Despite efforts such as these, private sector actions have not been sufficient to prevent the importation and sale of a wide variety and large volume of counterfeit and pirated goods to the American public.

. . .

A counterfeiter seeking to distribute fake products will typically set up one or more accounts on online third-party marketplaces. The ability to rapidly proliferate third-party online marketplaces greatly complicates enforcement efforts, especially for intellectual property rights holders. Rapid proliferation also allows counterfeiters to hop from one profile to the next even if the original site is taken down or blocked. On these sites, online counterfeiters can misrepresent products by posting pictures of authentic goods while simultaneously selling and shipping counterfeit versions.

. . .

Not only can counterfeiters set up their virtual storefronts quickly and easily, but they can also set up new virtual storefronts when their existing storefronts are shut down by either law enforcement or through voluntary initiatives set up by other stakeholders such as market platforms, advertisers, or payment processors.

*Id.* at 5, 11, 12.

11.  eCommerce giant Alibaba has also made public its efforts to control piracy and counterfeiting on its platform.  It formed a special task force that worked in conjunction with Chinese authorities for a boots-on-the-ground effort in China to stamp out counterfeiters. In describing the counterfeiting networks it uncovered, Alibaba expressed its frustration in dealing with "vendors, affiliated dealers and factories" that rely upon fictitious identities that enable counterfeiting rings to play whack-a-mole with authorities:

# Fighting China's counterfeits in the online era

Xinhua | Updated: 2017-09-19 14:20



BEIJING - A secret team in Chinese e-commerce giant Alibaba has the task of pretending to be online consumers who test-buy purchases from the billion-plus products on its platforms.

Alibaba's Anti-Counterfeiting Special Task Force, formed last year, actively works with local law enforcement agencies, said Qin Seng.

"After we clean up online shops selling counterfeits, the counterfeiters usually change their identities and places of dispatch, using more covert means to continue selling online," Qin said.

The team uses big data to identify counterfeits and the vendors, affiliated dealers and factories suspected of producing or selling counterfeit items. They pass evidence to the public security, administration of commerce and industry, quality inspection, food and drug supervision and other law enforcement agencies. At the same time, they investigate the evidence in the field.

The team faces many risks in their offline probes.

"Most counterfeiting dens are hidden and well-organized. For example, we encountered a village producing counterfeits. The villagers installed cameras everywhere and when they saw outsiders entering, they became vigilant and even threatened us," Qin said.

See Xinhua, *Fighting China's Counterfeits in the Online Era,* China Daily (Sept. 19, 2017), available at www.chinadaily.com.cn/business/2017-09/19/content_32200290.htm (**Exhibit 3**).

12. Plaintiff has been and continues to be irreparably harmed through loss of control over Plaintiff's reputation, goodwill, ability to license and the quality of goods featuring the Tytti Fallon Work. The rise of eCommerce as a method of supplying goods to the public exposes brand holders and content creators that make significant investments in their products to significant harm from counterfeiters:

Counterfeiting is no longer confined to street-corners and flea markets. The problem has intensified to staggering levels, as shown by a recent Organisation for Economic Cooperation and Development (OECD) report, which details a 154 percent increase in counterfeits traded internationally — from $200 billion in 2005 to $509 billion in 2016. Similar information collected by the U.S. Department of Homeland Security (DHS) between 2000 and 2018 shows that seizures of infringing goods at U.S. borders have increased 10-fold, from 3,244 seizures per year to 33,810.

…

The rise in consumer use of third-party marketplaces significantly increases the risks and uncertainty for U.S. producers when creating new products. It is no longer

enough for a small business to develop a product with significant local consumer demand and then use that revenue to grow the business regionally, nationally, and internationally with the brand protection efforts expanding in step. Instead, with the international scope of e-commerce platforms, once a small business exposes itself to the benefits of placing products online — which creates a geographic scope far greater than its more limited brand protection efforts can handle — it begins to face increased foreign infringement threat.

. . .

Moreover, as costs to enter the online market have come down, such market entry is happening earlier and earlier in the product cycle, further enhancing risk. If a new product is a success, counterfeiters will attempt, often immediately, to outcompete the original seller with lower-cost counterfeit and pirated versions while avoiding the initial investment into research and design.

. . .

Counterfeiters have taken full advantage of the aura of authenticity and trust that online platforms provide. While e-commerce has supported the launch of thousands of legitimate businesses, their models have also enabled counterfeiters to easily establish attractive "store-fronts" to compete with legitimate businesses.

*See Combating Trafficking in Counterfeit and Pirated Goods*, Jan. 24, 2020, (**Exhibit 2**) at 4, 8, 11.

13.     Not only are the creators and copyright owners harmed, the public is harmed as well:

The rapid growth of e-commerce has revolutionized the way goods are bought and sold, allowing for counterfeit and pirated goods to flood our borders and penetrate our communities and homes. Illicit goods trafficked to American consumers by e-commerce platforms and online third-party marketplaces threaten public health and safety, as well as national security. This illicit activity impacts American innovation and erodes the competitiveness of U.S. manufacturers and workers. The President's historic memorandum provides a much warranted and long overdue call to action in the U.S. Government's fight against a massive form of illicit trade that is inflicting significant harm on American consumers and businesses. This illicit trade must be stopped in its tracks.

*Id.* at 3, 4. (Underlining in original).

14.     Plaintiff's investigation shows that the telltale signs of an illegal piracy ring are present in the instant action. For example, Schedule A shows the use of store names by the Defendant Internet Stores that employ no normal business nomenclature and, instead, have the appearance of being made up, or if a company that appears to be legitimate is used, online research shows that there

is no known address for the company. Thus, the Defendant Internet Stores are using fake online storefronts designed to appear to be selling genuine Tytti Fallon Products, while selling inferior imitations of Plaintiff's Tytti Fallon Products. The Defendant Internet Stores also share unique identifiers, such as design elements and similarities of the infringing products offered for sale, establishing a logical relationship between them and suggesting that Defendants' illegal operations arise out of the same transaction, occurrence, or series of transactions or occurrences. Defendants attempt to avoid liability by going to great lengths to conceal both their identities and the full scope and interworking of their illegal piracy operation. Plaintiff is forced to file this action to combat Defendants' infringement of Plaintiff's Tytti Fallon Work, as well as to protect unknowing consumers from purchasing unauthorized Tytti Fallon Products over the internet.

15. This Court has personal jurisdiction over each Defendant, because each Defendant conducts significant business in Illinois and in this judicial district. Furthermore, the acts and events giving rise to this lawsuit were undertaken in Illinois and in this judicial district. In addition, each defendant has offered to sell and ship infringing products into this judicial district.

**THE PLAINTIFF**

16. Plaintiff, TYTTI FALLON, is the owner of the Copyright Registration that protects the creative content of the Tytti Fallon Work. Fallon is a self-taught artist who creates adult coloring pages, notebooks, and gratitude journals with unique designs. Fallon is inspired by nature, animals, and the natural beauty of women. Her work was featured in the Bohemian Beauties Special by Colouring Heaven, one of the world's best-selling coloring magazine brands.

17. Fallon has expended substantial time, money, and other resources in developing, advertising, and otherwise promoting the Tytti Fallon Work. As a result, products associated with

the Tytti Fallon Work are recognized and exclusively associated by consumers, the public, and the trade as products authorized by Fallon (the "Tytti Fallon Products").



https://www.amazon.com/stores/author/B0B5VSY8ZV/allbooks?ingress=0&visitId=0ab7232d-2a5d-49d8-8f46-69de2ff23650&store_ref=ap_rdr&ref_=ap_rdr

18.     Plaintiff is the owner of the United States Copyright Registration that covers the Tytti Fallon Work. The Registration is valid, subsisting, and in full force and effect. A true and correct copy of the registration certificate for the Tytti Fallon Work is attached hereto as **Exhibit 1**.

19.     In an effort to illegally profit from the creative content of the Tytti Fallon Work, Defendants have created numerous Defendant Internet Stores and have designed them to appear to be selling authorized Tytti Fallon Products.

20.     Fallon has invested substantial time, money, and effort in building up and developing consumer awareness, goodwill, and recognition in the Tytti Fallon Work.

21.    The success of the Tytti Fallon Work is due in large part to Plaintiff's marketing, promotional, and distribution efforts.

22.    As a result of Plaintiff's efforts, the quality of the Tytti Fallon Products, the promotional efforts for Plaintiff's products and designs, press and media coverage, and social media coverage, members of the public have become familiar with the Tytti Fallon Work and associate it exclusively with Plaintiff.

23.    Fallon has made efforts to protect Plaintiff's interests in and to the Tytti Fallon Work. No one other than Fallon and Plaintiff's licensees are authorized to manufacture, import, export, advertise, create derivative works, offer for sale, or sell any goods utilizing the Tytti Fallon Work without the express written permission of Fallon.

## THE DEFENDANTS

24.    Defendants are individuals and business entities who, upon information and belief, reside in the People's Republic of China or other foreign jurisdictions. Defendants conduct business throughout the United States, including within Illinois and in this judicial district, through the operation of the fully interactive commercial websites and online marketplaces operating under the Defendant Internet Stores. Each Defendant targets the United States, including Illinois, and has offered to sell and, on information and belief, has sold and continues to sell illegal Tytti Fallon Products to consumers within the United States, including Illinois and in this judicial district.

## THE DEFENDANTS' UNLAWFUL CONDUCT

25.    The success of the Tytti Fallon Work has resulted in significant copying of the creative content protected by Plaintiff's copyright registration. Plaintiff has identified numerous fully interactive websites and marketplace listings on various platforms. Each Defendant targets consumers in the United States, including the State of Illinois, and has offered to sell and, on

information and belief, has sold and continues to sell infringing products that violate Plaintiff's intellectual property rights in the Tytti Fallon Work ("Infringing Products") to consumers within the United States, including the State of Illinois.

26. Upon information and belief, Defendants facilitate sales by designing the Defendant Internet Stores so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers selling genuine Tytti Fallon Products.

27. The Defendant Internet Stores intentionally conceal their identities and the full scope of their piracy operations in an effort to deter Plaintiff from learning Defendants' true identities and the exact interworking of Defendants' illegal operations. Through their operation of the Defendant Internet Stores, Defendants are directly and personally contributing to, inducing, and engaging in the sale of Infringing Products as alleged, often times as partners, co-conspirators, and/or suppliers. Upon information and belief, Defendants are an interrelated group of infringers working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell Infringing Products.

28. Upon information and belief, at all times relevant hereto, the Defendants in this action have had full knowledge of Plaintiff's ownership of the Tytti Fallon Work, including Plaintiff's exclusive right to use and license such intellectual property and the goodwill associated therewith.

29. Defendants often go to great lengths to conceal their identities by often using multiple fictitious names and addresses to register and operate their massive network of Defendant Internet Stores. Upon information and belief, Defendants regularly create new websites and online marketplace accounts on various platforms using the identities listed in Schedule A to the Complaint, as well as other unknown fictitious names and addresses. Such Defendant Internet Store registration

patterns are one of many common tactics used by the Defendants to conceal their identities, the full scope and interworking of their massive pirating operation, and to avoid being shut down.

30.     The Infringing Products for sale in the Defendant Internet Stores bear similarities and indicia of being related to one another, suggesting that the Infringing Products were manufactured by and come from a common source and that, upon information and belief, Defendants are interrelated. The Defendant Internet Stores also include other notable common features, including use of the user name registration patterns, unique shopping cart platforms, accepted payment methods, check-out methods, meta data, illegitimate SEO tactics, HTML user-defined variables, lack of contact information, identically or similarly priced items and volume sales discounts, similar hosting services, similar name servers, and the use of the same text and images.

31.     In addition to operating under multiple fictitious names, Defendants in this case and defendants in other similar cases against online infringers use a variety of other common tactics to evade enforcement efforts. For example, infringers like Defendants will often register new online marketplace accounts under new aliases once they receive notice of a lawsuit. Infringers also often move website hosting to rogue servers located outside the United States once notice of a lawsuit is received. Rogue servers are notorious for ignoring takedown demands sent by brand owners. Infringers also typically ship products in small quantities via international mail to minimize detection by U.S. Customs and Border Protection. A 2021 U.S. Customs and Border Protection report on seizure statistics indicated that e-commerce sales accounted for 13.3% of total retail sales with second quarter of 2021 retail e-commerce sales estimated at $222.5 billion. U.S. Customs and Border Protection, *Intellectual Property Right Seizure Statistics*, FY 2021 (https://www.cbp.gov/sites/default/files/assets/documents/2022-Sep/202994%20-%20FY%202021%20IPR%20Seizure%20Statistics%20BOOK.5%20-

%20FINAL%20%28508%29.pdf) at 23. A true and correct copy of CBP's FY 2021 report is attached hereto as **Exhibit 4**. In FY 2021, there were 213 million express mail shipments and 94 million international mail shipments. *Id.* Nearly 90 percent of all intellectual property seizures occur in the international mail and express environments. *Id.* at 27. The "overwhelming volume of small packages also makes CBP's ability to identify and interdict high risk packages difficult." *Id.* at 23.

32.     Further, infringers such as Defendants, typically operate multiple credit card merchant accounts and third-party accounts, such as PayPal, Inc. ("PayPal") accounts, behind layers of payment gateways so that they can continue operation in spite of Plaintiff's enforcement efforts. Upon information and belief, Defendants maintain off-shore bank accounts and regularly move funds from their PayPal accounts to off-shore bank accounts outside the jurisdiction of this Court. Indeed, analysis of PayPal transaction logs from previous similar cases indicates that offshore infringers regularly move funds from U.S.-based PayPal accounts to foreign-based bank accounts, such as China-based bank accounts, outside the jurisdiction of this Court.

33.     Additionally, upon information and belief, Defendants use other unauthorized search engine optimization (SEO) tactics and social media spamming so that the Defendant Internet Stores listings show up at or near the top of relevant search results and misdirect consumers searching for genuine Tytti Fallon Products. Further, Defendants utilize similar illegitimate SEO tactics to propel new Defendant Internet Stores to the top of search results after others are shut down.

34.     Defendants, without any authorization or license, have knowingly and willfully pirated Plaintiff's Tytti Fallon Work in connection with the advertisement, distribution, offering for sale, and sale of illegal products into the United States and Illinois over the internet. Each Defendant Internet Store offers shipping to the United States, including Illinois, and, on

information and belief, each Defendant has offered to sell Infringing Products into the United States, including Illinois.

## COUNT I
## COPYRIGHT INFRINGEMENT

35.     Plaintiff repeats and incorporates by reference herein the allegations contained in the above paragraphs of this Complaint.

36.     The Tytti Fallon Work has significant value and has been produced and created at considerable expense.

37.     At all relevant times, Plaintiff has been the holder of the pertinent exclusive rights infringed by Defendants, as alleged hereunder, including but not limited to the Tytti Fallon Work, including derivative works. The Tytti Fallon Work is the subject of a valid Copyright Registration Certificate issued by the Register of Copyrights. (**Exhibit 1**).

38.     Each Defendant, without the permission or consent of Plaintiff, has, and continues to sell online pirated derivative works of the copyrighted Tytti Fallon Work. Each Defendant has violated Plaintiff's exclusive rights of reproduction and distribution. Each Defendant's actions constitute infringement of Plaintiff's exclusive rights protected under the Copyright Act (17 U.S.C. §101 et seq.).

39.     The foregoing acts of infringement constitute a collective enterprise of shared, overlapping facts and have been willful, intentional, and in disregard of and with indifference to the rights of the Plaintiff.

40.     As a result of each Defendant's infringement of Plaintiff's exclusive rights under copyright, Plaintiff is entitled to relief pursuant to 17 U.S.C. §504 and to Plaintiff's attorneys' fees and costs pursuant to 17 U.S.C. §505.

41.    The conduct of each Defendant is causing and, unless enjoined and restrained by this Court, will continue to cause Plaintiff great and irreparable injury that cannot fully be compensated or measured in money. Plaintiff has no adequate remedy at law. Pursuant to 17 U.S.C. §§502 and 503, Plaintiff is entitled to injunctive relief prohibiting each Defendant from further infringing Plaintiff's copyrights and ordering that each Defendant destroy all unauthorized copies.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1)   That Defendants, their affiliates, officers, agents, employees, attorneys, and all persons acting for, with, by, through, under, or in active concert with them be temporarily, preliminarily, and permanently enjoined and restrained from:

a.   using the Tytti Fallon Work or any reproductions, copies, or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not an authorized Tytti Fallon Product or is not authorized by Plaintiff to be sold in connection with the Tytti Fallon Work;

b.   passing off, inducing, or enabling others to sell or pass off any product or not produced under the authorization, control, or supervision of Plaintiff and approved by Plaintiff for sale under the Tytti Fallon Work;

c.   further infringing the Tytti Fallon Work and damaging Plaintiff's goodwill;

d.   shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not authorized by Plaintiff to be sold or offered for sale, and which directly use the Tytti Fallon Work, and which are derived from Plaintiff's copyrights in the Tytti Fallon Work; and

e. using, linking to, transferring, selling, exercising control over, or otherwise owning the Defendant Internet Stores, or any other online marketplace account that is being used to sell products or inventory not authorized by Plaintiff which are derived from Plaintiff's copyrights in the Tytti Fallon Work;

2) Entry of an Order that, upon Plaintiff's request, those in privity with Defendants and those with notice of the injunction, including any online marketplaces, social media platforms, Facebook, YouTube, LinkedIn, Twitter, internet search engines such as Google, Bing, and Yahoo, web hosts for the Defendant Internet Stores, shall:

a. disable and cease providing services for any accounts through which Defendants engage in the sale of products not authorized by Plaintiff which reproduce the Tytti Fallon Work or are derived from the Tytti Fallon Work, including any accounts associated with the Defendants listed on Schedule A;

b. disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of products not authorized by Plaintiff which are derived from the Tytti Fallon Work; and

c. take all steps necessary to prevent links to the Defendant accounts identified on Schedule A from displaying in search results, including, but not limited to, removing links to the Defendant accounts from any search index;

3) For Judgment in favor of Plaintiff against Defendants that they have: a) willfully infringed Plaintiff's rights in Plaintiff's federally registered copyrights pursuant to 17 U.S.C. §501; and b) otherwise injured the business reputation and business of Plaintiff by Defendants' acts and conduct set forth in this Complaint;

4)  For Judgment in favor of Plaintiff against Defendants for actual damages or statutory damages pursuant to 17 U.S.C. §504, at the election of Plaintiff, in an amount to be determined at trial;

5)  That Plaintiff be awarded Plaintiff's reasonable attorneys' fees and costs; and

6)  Award any and all other relief that this Court deems just and proper.

DATED: January 2, 2024                              Respectfully submitted,

                                                                  */s/ Keith A. Vogt*
                                                                  Keith A. Vogt (Bar No. 6207971)
                                                                  Keith Vogt, Ltd.
                                                                  33 West Jackson Boulevard, #2W
                                                                  Chicago, Illinois 60604
                                                                  Telephone: 312-971-6752
                                                                  E-mail:  keith@vogtip.com

                                                                  **ATTORNEY FOR PLAINTIFF**